UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:10-cv-35 RJC-DCK

| THE TRAVELERS INDEMNITY COMPANY, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | **ORDER** |
| vs. | ) |  |
|  | ) |  |
| CROWN CAB COMPANY, INC., | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## I. FACTUAL BACKGROUND

This dispute concerns the proper classification of Defendant Crown Cab Company, Inc.'s (Crown's) drivers. The plaintiff, Travelers Indemnity Company (Travelers), seeks a declaratory judgment that the defendant's drivers are employees and not independent contractors, as well as damages for the defendant's alleged breach of contract relating to the workers' compensation insurance policy that Plaintiff provided to Defendant.[1] The following facts are drawn from the Complaint as well as the evidentiary material of record. Inasmuch as Travelers is seeking summary judgment, all factual disputes have been resolved in favor of Crown, as the party resisting summary judgment.

The Complaint describes that an insured's premium for workers' compensation policies is based on several factors that include the number of employees, the classification of employees, and the wages paid to employees. (Doc. No. 1, ¶ 6). It further states that a

---

[1] The insurance policy at issue, policy number 0-115N689-09, lasted from February 21, 2009 to February 21, 2010.

"[p]remium for each year is initially estimated and payments are made based on the estimate." After the policy expires, "an audit is performed to 'true up' the policy" and thereby verify factors and calculate the final premium. (Doc. No. 1, ¶ 7). There are two types of audits that Plaintiff performs: either a Policy Holder Report (PHR) or a physical audit. In a PHR, the plaintiff sends a blank form to the insured that the insured fills out and mails back with supporting documentation, which is reviewed by an audit processor. (Doc. No. 38-2 at 3). In a physical audit, the plaintiff sends and auditor to visit the insured's place of business and review their records. (Id. at 4).

Travelers insured Crown from 2004-2010 and performed PHRs of the 2004, 2005, and 2007 policies and physical audits of the 2006, 2008, and 2009 policies. Up until 2008, Travelers classified Crown's drivers as independent contractors. Then in 2009, the plaintiff conducted a physical audit of Crown's 2008-2009 policy and determined that "most if not all of the drivers employed by Crown are employees, and not independent contractors," (Doc. No. 1, ¶¶ 9). Travelers thus notified Crown that its premium would be adjusted for the 2009-2010 policy year by an additional $121,819. (Doc. No. 38-4: Travelers Workers Compensation and Employers Liability Policy Change Document).[2] Crown objected to the reclassification of its drivers, but Travelers did not respond; instead, eight months later, Travelers sued Crown for failing to pay the increased premium.

---

[2] Although Plaintiff admits that it did not charge Crown Cab a workers compensation premium in prior years, its lawsuit only focuses on the 2009 policy because Plaintiff states that it takes responsibility for erroneously excluding the drivers from coverage in those prior years and told Crown Cab that "in recognition of that fact, we will not retroactively include the payroll for those individuals on expired policy terms but rather will only include their payrolls on the current policy." (Doc. No. 15-1: Travelers' letter to Crown Cab). Plaintiff also points out that each policy is "a separate contract and needs to be analyzed separately." (Doc. No. 15, pp. 1-2).

Defendant denies that its drivers are employees and disputes the propriety of Plaintiff's latest audit. (Doc. No. 13, p.2). The defendant also raises the affirmative defenses that Travelers' claims are barred by the doctrines of waiver, acquiescence, ratification, estoppel, and laches because Travelers had performed similar audits of past Crown Cab policies that did not result in any reclassification of Crown's drivers. (Doc. No. 8 at 3-4: Answer; Doc. No. 13 at 2: Memo in Support of Motion to Compel Discovery).

### A. Crown and its Drivers

Crown operates a taxicab and transportation business in Charlotte, North Carolina. It has two main areas of business: 1) providing transportation services to contract clients and 2) serving as a "conduit for taxi services" to the general pubic. (Doc. No. 38-5 at 2). Like all businesses that operate passenger vehicles for hire (PVHs) in Charlotte, Crown is regulated by Chapter 22 of the Charlotte Municipal Code (the Code). See Charlotte Municipal Code, § 22 et. sec.

The Code distinguishes between two types of PVHs: taxicabs and nonmetered or contract vehicles. Under the Code, Crown's taxicabs have to be painted with a distinctive color scheme, have meters and top lights, and are permitted to pick up passengers from taxi stands. Nonmetered vehicles (as the name suggests), do not have meters or toplights and they also do not need to be painted with Crown's color scheme but are required to bear a Crown decal. These vehicles cannot pick up passengers from taxi stands but can only perform contracted-for transportation. The Code further requires that drivers be affiliated with a "company operating certificate holder" (Code § 22-103(4)) such as Crown at all times; that drivers use their company's meter, radio equipment, and dispatcher service; and that drivers comply with the established taxicab rates and fares.

B.   **Taxicab Drivers**

Crown's taxicab drivers, like other cab drivers, make money directly from passenger fares based on the number of trips they make in a given day. During the 2009-2010 policy period, some of Crown's drivers performed only contract work while others only taxi work, but most of Crown's drivers performed a mix of contract and taxi work. (Doc. No. 38-6 at 36). They each paid a weekly $125.00 franchise fee[3] to Crown, regardless of the amount of work they performed in a given week; in return, the drivers got to "piggy back" off Crown's right to provide taxicab services in Charlotte, and obtain work through Crown's dispatching services. See (Doc. No. 38-6 at 12).[4]

In May 2009, Crown quit using radio dispatchers and switched to using automated GPS devices, carried by each Crown driver, in which trips were loaded into a computer system and automatically sent to the driver closest to the passenger to be picked up. Drivers were required to press a button on the device when picking up and dropping off a passenger, which logged the trip's completion, before the device would offer them another trip. (Doc. No. 38-6 at 22-23). This sent Crown the GPS coordinates for the drivers' pick-up and drop-off locations as well as time stamps for all trips that the drivers received through Crown.

Under both systems, drivers were not required to be in any specific location or work any specific hours, were entitled to reject any trip and just cruise for fares, and were free to obtain

---

[3] During the policy period, the franchise fee increased from $125.00 to $132.00 per week for drivers who owned their own vehicle and to $267 for drivers who rented a vehicle from Crown. (Doc. No. 38-5 at 26).

[4] Crown also had the right to operate 12 taxis at the airport for which it paid the city of Charlotte $1,250 per month. Drivers "highly coveted" the airport driving slots, and Crown chose which of its drivers got to be at the airport based on seniority. (Doc. No. 38-6 at 26). Outside the airport, there was no limit on the number of drivers or taxicabs that Crown could operate.

work directly from private customers. However, under the radio dispatch system, drivers could be "marked out" of the zone system for failing to answer their radio or refusing a call in their zone, and drivers who refused three calls in a row would not be marked back in. (Doc. No. 38-16: Crown Cab Radio Dispatch and Drivers Policies and Procedures). Drivers could also be put on the "no-calls list," which would generally prevent them from receiving any calls from Crown for one or two hours, for failing to show up after taking a call, marking in or bidding on calls while on the way to pick up a customer, or arguing over the radio.

When drivers were paid in cash by their passengers, the drivers retained all of their fares and tips. If, however, the drivers chose to accept payment by credit card, then Crown deducted a 10% processing fee and applied the remainder of the payment towards the driver's franchise fee. If there was any excess, Crown gave the driver cash back. Similarly, if a passenger paid with a check, the passenger was required to make it payable to Crown, then Crown would cash the check and credit the value of the check toward the amount the driver owed Crown (and pay back any excess to the driver).

### C. Contract Drivers

Crown's contract drivers, in contrast, are not paid by passengers but are paid by Crown from the proceeds of its contracts with corporate clients. Like taxicabs, the payment amount during the 2009-2010 policy period was based on the total number of trips completed and whether the driver owned or rented his/her vehicle. Instead of a set franchise fee, Crown deducted 30% of the weekly gross total in addition to equipment rental fees. See (Doc. No. 38-11: Crown Cab's Fee Structure). Crown also deducted the amount of any fines it had imposed against the driver, then ultimately issued 1099 tax forms reflecting the reduced amount.

During the relevant policy period, Crown's primary contract client was the North

Carolina Department of Social Services (DSS), for whom it provided transportation services on a weekly basis, which accounted for 80-90% of Crown's total revenue.[5] Each day, DSS sent a schedule of requested trips to Crown, which Crown then assigned and distributed to its drivers. The schedule identified the driver by number and listed the name of the client to be picked up, the pick-up and drop-off locations, and the time of the trip. Drivers were supposed to check off trips they completed, mark any trips they did not complete, and then sign and return the schedules to Crown in order to be paid for those trips. If a driver did not want to do a trip, he or she would inform the dispatcher, and the trip would be reassigned to another driver. DSS paid Crown on a monthly basis, while Crown gave drivers the option of being paid on a weekly, biweekly, or monthly basis.

In certain circumstances, Crown dealt with problems arising from both taxi and contract work by imposing fines, suspension, or termination. This could occur when drivers took trips assigned to other drivers, confronted dispatchers in Crown's office, or received too many complaints from contract clients. If, for example, DSS complained to and fined Crown, then Crown would pass these complaints and fines on to its drivers. Sometimes, Crown would also fine drivers for conduct that did not result in fines from DSS, such as when a driver claimed to have completed a trip that was not actually completed.

### D. Selection of Drivers

Crown only used individual drivers, and most of the drivers worked only for Crown. Crown screened potential drivers and explained to them the potential benefits and losses of the

---

[5] DSS did not renew its contract with Crown in or around July 2010. Because that contract accounted for so much of Crown's revenue, Crown's contract business was substantially reduced.

"independent contractor experience." (Doc. No. 38-6 at 6). Crown gave each prospective driver a step-by-step list of how to obtain a permit and comply with the Code requirements for PVHs in Charlotte, which included the completion of training provided by the city's PVH board. Crown would also review a candidate's drug test and background check and then sign off on the applicant's PVH application, thus allowing the applicant to obtain an operating permit under the auspices of Crown. See (Doc. No. 38-10 at 4). As Crown states, "[a]nyone who 1) has a valid driver's license; 2) has a social security card; 3) passes a drug test; and 4) passes a fingerprint test, has the ability to drive for Crown." (Doc. No. 41 at 4). Finally, Crown required brand new drivers to participate in a one-day ride-along orientation with an experienced Crown driver.

### E. Independent Contractor Agreement

The Code authorizes company operating certificate holders, such as Crown, to enter into an agreement with any driver to act as an independent contractor so long as the vehicle owner maintains insurance on the vehicle and the company indemnifies the City against any wrongdoing by the driver. (Code, Sec. 22-217). Accordingly, Crown requires its drivers to sign an independent operator's agreement, which states that:

> "once the CONTRACTOR takes possession of the taxicab, he/she will exercise complete discretion in the operation of the same and in performance of those duties generally recognized to be part of performing taxicab services. Discretion in the operation of the said taxicab is vested in the CONTRACTOR, and CROWN shall do no more than make available to CONTRACTOR telephone call service or radio / computer dispatch service of prospective passenger... CONTRACTOR acknowledges and agrees that in every respect he/she is an independent contractor in the performance of this agreement... CONTRACTOR is free to perform all or part of his/her taxicab services independently of CROWN'S dispatching system or concession agreement and contracts."

(Doc. No. 38-12-15). The agreement also alerts drivers that they will not be covered by worker's compensation, stating:

> "CONTRACTOR further acknowledge[s] that as independent business person, free from

authority and control of the CROWN, he is not covered by worker's compensation insurance provided by CROWN, and that he/she expressly waives any such coverage as a condition of this independent status."

(Id.). Crown points out that none of its drivers have ever attempted to file a claim for worker's compensation benefits.

## II. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658,

8

2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

**III.   ANALYSIS**

At the outset, this Court addresses the significance of the independent contractor agreement signed by Crown's drivers. Although the agreement clearly designates the drivers as independent contractors, "[a] contract declaring one an independent contractor free from control and direction by the owner does not in fact establish that relationship." Watkins v. Murrow, 253 N.C. 652, 657, 118 S.E.2d 5, 9 (1961). Rather, the courts "generally look beyond the contract to the actual relationship of the parties to determine the question of whether or not one is an independent contractor." Grouse v. DRB Baseball Management, 121 N.C.App. 376, 381, 465 S.E.2d 568, 572 (1996); see also, Gilreath v. Yellow Cab of Charlotte, L 3775, 1 -2 (N.C.App.,2007) (unpublished). Thus, this Court will look at the actual relationship between Crown and its drivers.

Under North Carolina law, an independent contractor is defined as one who exercises an independent employment and contracts to do certain work according to his or her own judgment and method, without being subject to the employer except as to the results of the work. Youngblood v. North State Ford Truck Sales, 321 N.C. 380, 384 (1988). The determination of whether an individual is an employee or an independent contractor focuses on the issue of control, specifically whether the purported employer had the right to control the individual in the performance of his or her work. See Hayes v. Elon College, 224 N.C. 11, 15 (1944) (holding that the "vital test" in classifying a worker is whether the employer has "retained the right of control or superintendence over the contractor or employee as to details"); see also, McCown v. Hines, 353 N.C. 683, 549 S.E.2d 175 (2001); Youngblood, 321 N.C. at 384; Rhoney v. Fele, 134 N.C. App. 614, 518 S.E.2d 536 (1999). This is a mixed question of law and fact. See State ex

rel. Employment Sec. Com'n v. Faulk, 88 N.C. App. 369, 374 (1988); Rhoney, 134 N.C. App. at 616. The question of fact is what the terms of the employment agreement are; the question of law is whether those terms show an employee or independent contractor relationship. "[W]here the facts are undisputed or the evidence is susceptible of only a single inference and a single conclusion, the court must determine whether a party is an employee or an independent contractor as a matter of law." Johnson v. News and Observer Pub. Co., 167 N.C. App. 86, 88 (alteration in original) (internal quotations omitted).

The Hayes court further articulated eight factors that courts should consider in determining the proper classification of a worker. These factors are whether the worker:

> (a) is engaged in an independent business, calling, or occupation; (b) is to have the independent use of his special skill, knowledge, or training in the execution of the work; (c) is doing a specified piece of work at a fixed price or for a lump sum or upon a quantitative basis; (d) is not subject to discharge because he adopts one method of doing the work rather than another; (e) is not in the regular employ of the other contracting party; (f) is free to use such assistants as he may think proper; (g) has full control over such assistants; and (h) selects his own time.

Id. at 16. None of the factors are by themselves determinative. Rather, the factors are to be considered along with all other circumstances to determine if a worker has the level of independence required to properly be classified as an independent contractor. See id. In addition, because applying these factors sometimes requires the Court to resolve factual disputes, the Court views this evidence and any inferences from the evidence in the light most favorable to the nonmoving party at the summary judgment stage. See Anderson, 477 U.S. at 255.

Applying the Hayes factors, and the facts in a light most favorable to the nonmoving party, preponderates in favor of a finding that Crown's drivers were independent contractors. Crown's drivers may own their PVHs and are free to use them for personal reasons. They may develop their own clientele independently from Crown. They have no obligation to accept any

trips, whether taxicab or contract based, or to pick up any passengers. They can work any days and any hours that they choose. They determine their own routes. They do not wear uniforms. And despite the non-competition paragraph in the Independent Contractor agreement, there is evidence that drivers could drive for Crown and other companies at the same time, and in fact, that at least one driver simultaneously drove for Crown and Yellow Cab. (Doc. No. 41-2 at 94).

In particular, the third Hayes factor – which examines whether the worker is "doing a specified piece of work at a fixed price or for a lump sum or upon a quantitative basis" – cuts in favor of finding that Crown's drivers are independent contractors. See 224 N.C. at 16; see also, Rhoney, 134 N.C. at 540 ("Payment of a fixed contract price or lump sum ordinarily indicates that the worker is an independent contractor, while payment by a unit of time, such as an hour, day, or week, is strong evidence that the worker is an employee") quoting Youngblood, 321 N.C. at 384. Crown's drivers are clearly paid on a quantitative basis. It is undisputed that taxicab drivers are paid directly from passengers, and that they keep 100% of fares and tips (unless they voluntarily elect to accept credit card payments, in which case they pay a 10% processing fee to Crown). Similarly, contract drivers are paid in a lump sum that is based on their weekly gross total, with Crown taking a fixed percentage.

Some of the factors in Hayes indicate that the drivers are employees. For instance, Crown's drivers are in its "regular employ" (factor five). They also appear to be "subject to discharge [by adopting] one method of doing the work rather than another" (factor four) by virtue of the Independent Contractor Agreement, which states that the relationship is "at-will." On balance, however, the record shows that a reasonable jury could conclude that Crown did not maintain control over the manner and method of the drivers' work, but that the drivers retained "that degree of independence necessary to require [their] classification as independent

contractor[s] rather than employee[s]." See Hayes, 224 N.C. at 16.

As noted above, the Hayes court also indicated that when a worker "is free to use such assistants as he may think proper," it suggests that he is an independent contractor rather than an employee. Id. In this case, however, the contractual provision prohibiting the drivers from assigning their rights under the agreement or relinquishing custody of their taxicab does not demonstrate Crown's employer-like control over the drivers. This provision was presumably designed to ensure compliance with the Code by preventing drivers without PVH permits from operating taxicabs. This is different from Hayes, where a contract for the installation of six telephone poles and the transfer of electrical wires from old poles to the new poles prohibited the installer from choosing and hiring his own assistants. Performance of the Hayes contract required the labor of many people, whereas the performance of this contract required the labor of just one person: the driver. See id.; Fulcher by Wall v. Willard's Cab Co., 132 N.C. App. 74, 77-78 (N.C.App.,1999).

Travelers contends that the status of Crown's drivers, especially its contract drivers, is analogous to that of the plaintiffs in the unpublished Gilreath case. 181 N.C. App. 148. In Gilreath, the North Carolina Court of Appeals held that the plaintiff was an employee, not an independent contractor, of Defendant Yellow Cab of Charlotte. In that case, the defendant hired the plaintiff to drive only The Hilton of Charlotte's guests departing and arriving from the Charlotte airport, trained him on the job's requirements in "intricate detail," specifically instructed him to report to work by 7:00 a.m., six days per week, required him to wear a suit and drive one of Defendant's Lincoln Town Cars, and set a particular route between The Hilton and the airport when transporting guests. Unlike the plaintiff in Gilreath, the contract drivers in this case were not trained in "intricate detail" but only participated in a one-day orientation if they

12

were brand new. They were not given specific starting and ending times or required to work a certain number of days per week but set their own schedules and were offered contract trips that they were free to reject. In fact, the drivers were free to reject contract work altogether and operate solely as a taxicab if they so desired. Crown's contract drivers were not required to drive particular routes, wear any type of uniform, or use Crown's cars. Gilreath is thus distinguishable from the instant case in many critical respects.

This case is more like Alford, in which the North Carolina Court of Appeals addressed whether a cab driver is an employee or an independent contractor. In Alford, the court held that a taxicab driver who rented his cab from Victory Cab Company, Inc., and kept his fares and tips as compensation, was an independent contractor and not an employee. 30 N.C. App. 657. Despite the fact that the cab company "exercised considerable control over [Plaintiff's] work as a cabbie" in that the company assigned Plaintiff a cab, supervised his compliance with company rules and city ordinances, dispatched him on many of his calls, and "effectively required him to work long hours in order to protect his privilege to use a desirable cab," the appellate court found that he was still an independent contractor because the cab company had no supervision or control over the manner or method in which Plaintiff operated his cab. Id. at 661. Importantly, the Court noted, the plaintiff had complete control over his work schedule when he used the cab. See id..[6]

As in Alford, the fact that Crown ensured that its drivers complied with the Code is not

---

[6] See also, Fulcher, 132 N.C. App. 74 (holding that a taxicab driver who leased his vehicle from a cab company was an independent contractor rather than an employee of the cab company, even though the driver was obligated by his contract to not possess a handgun while driving the cab and to prevent any other person from operating the cab, where the driver kept all his fees and tips, was not restricted to any geographic area and was free to refuse calls from the cab company's dispatcher).

13

indicative of an employer-employee relationship.  See 30 N.C. App. 657.  Although the drivers were also subject to certain restrictions outside of what was required by the Code – including penalties for violating the Crown's Policies and Procedures, receiving too many client complaints, or committing fraud – these restrictions, like the restrictions imposed on drivers in Alford, do not necessarily transform Crown's drivers into employees.  Rather, a reasonable jury could conclude that despite the regulations, the drivers ultimately performed their work according to their own judgment and method, without being subject to Crown except as to the results of the work.  See id.; Youngblood, 321 N.C. at 384.  In sum, this Court finds that the undisputed evidence and the inferences from that evidence, in the light most favorable to Crown, show that Crown's drivers are not employees as a matter of law but that a reasonable jury could conclude that they are independent contractors.  Travelers is therefore not entitled to a declaratory judgment, and its motion for summary judgment is denied.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED THAT:**

1. The Travelers Indemnity Company's Motion for Summary Judgment on First and Second Claims for Relief (Doc. No. 37) is **DENIED**.

Signed: May 10, 2011

Robert J. Conrad, Jr.
Chief United States District Judge